## ROBERTS v. THE PEOPLE.

1. Under the statute an application for a change of venue must be made at the earliest moment.

2. When a want of information is set up as an excuse for the failure of a party to avail himself of a legal right within the time prescribed by law, no case for relief exists if it appears that the party voluntarily shut his eyes to the facts and remained wilfully ignorant of the requisite information.

3. The statute providing for a change of venue is only mandatory upon the court where the party applying has brought himself within the provisions.

4. The judge of a court cannot reasonably be required to postpone the business of his court in order to suit the convenience of lawyers who may desire to attend the sessions of other courts.

5. In prosecutions for obtaining money or property under false representations it is held not to be essential to constitute the offense charged that the pretenses by which the money or property is obtained were made directly to the party defrauded.

6. Where the evidence corresponds with the indictment in its general design and purport a technical variance will not be fatal.

7. Ample authority is conferred by the statute on the county clerk to administer all oaths necessary to be administered in matters pertaining to the business and duties of his office, and also to administer oaths generally.

8. The statutes provide for the appointment of deputy clerks and their qualification, and it necessarily follows that a deputy is authorized to administer all oaths proper to be administered and taken in the transaction of official business pertaining to the office of county clerk, and in performing the functions of clerk thereof.

9. The rule governing the allowance of claims by the board of county commissioners is that the authority must be found in the statutes, either in express words or by fair implication.

10. The compensation for every legitimate charge against the county is not fixed by statute, nor even expressly provided for, but it is within the functions of the board of county commissioners, in such cases, to allow reasonable compensation.

11. The provisions of the statute for the appointment of deputy assessors are a recognition by the general assembly that assistance for the assessor may become a necessity, and, when it does, it will constitute a proper charge against the county.

12. It not being through any neglect or default of the assessor that the county was not divided into districts which would have authorized him to appoint deputies instead of clerks, it would be inequitable to require the assessor to bear the expenses thus necessarily incurred. Having paid the clerks, the assessor's right to reimbursement, although not covered by the express terms of the statute, may be fairly implied therefrom, also the power of the commissioners to allow the claim.

13. The principle is recognized in criminal jurisprudence that proof of certain facts may lead irresistibly to the presumption that another act, of which there is no direct proof, was committed or done.

*Error to Criminal Court of Arapahoe County.*

ROBERTS, the defendant below, was tried and convicted of the crime of obtaining money under false pretenses, at the September term, 1884, of the criminal court of Arapahoe county. Motions for a new trial and in arrest of judgment were made and denied, and the prisoner sentenced to confinement in the penitentiary for a period of ten months. Defendant was the county assessor of Arapahoe county in the year 1883, and previous years, and in consequence of the great amount of clerical work

required to be performed in his office, the county commissioners had allowed him, for a period of three years or more, to employ as many clerks as were necessary to complete the assessments in the time limited by statute, at the expense of the county. Defendant was accustomed to pay these clerks, afterwards presenting bills therefor to the commissioners, which were audited, allowed, and warrants drawn upon the county treasurer for the several sums, payable to bearer, and delivered to the defendant, who would collect the same. It was finally discovered that defendant was defrauding the county by charging for more clerical work than was performed, and at higher rates of compensation than he paid therefor. It appeared in evidence, upon an investigation of his conduct by the county attorney and the board of commissioners, that he had presented several fraudulent vouchers which had been allowed and paid. It also appeared that, when charged by the commissioners with the perpetration of these frauds, he admitted the making of overcharges, but claimed the right to do so. He also admitted that he had realized in this manner, during the preceding three years, as nearly as he could estimate, the sum of $3,108. The count of the indictment under which he was tried and convicted charges, substantially, that on the 5th day of July, 1883, said Roberts was county assessor of Arapahoe county, and, with intent to cheat and defraud said county, he falsely and fraudulently represented that a certain account in favor of one Charles M. Farrar, and against said county, which he then and there presented to said county for allowance and payment, was a just and true account of the indebtedness of the county to said Charles M. Farrar for services rendered during the month of June, 1883, in making the assessment of real and personal property in said county.

A copy of the account, with the affidavit attached thereto, is inserted in the indictment, and is as follows:

"VOUCHER.

"DENVER, COLORADO, June 30, 1883.

"*County of Arapahoe to C. M. Farrar, Dr.*

"Services: Assessment, 1883.   June, 16 days, $6, $96.

"*State of Colorado, County of Arapahoe — ss.:* George C. Roberts, being first duly sworn, doth depose and say that the above account is legal, just and true, and that the services therein charged for have been actually and necessarily rendered to and for said county, and that the same has not been paid, nor any part thereof.

"GEORGE C. ROBERTS, Assessor.

"Subscribed and sworn to before me this 30th day of June, A. D. 1883.

"W. H. SALLSBURY, Deputy County Clerk."

The indictment further charges that defendant falsely and fraudulently pretended that Farrar had performed sixteen days' service in the month of June, 1883, in making said assessment; that he demanded $6 per day for his services; and that defendant had full right and authority to collect the amount of the account prescribed, $96, from said county.   By way of negation of the pretenses, it is alleged that Farrar did not serve sixteen days in June, 1883, in making said assessment, but served seven and one-half days only; that he did not demand $6 per day for his services, but only the sum of $4 per day; and that the county was indebted for said services the sum of $30 only, which was all that defendant had the right or authority to collect from the county.   It then alleges that the county of Arapahoe, relying upon and believing these false pretenses to be true, delivered to the defendant $96 in lawful money of the United States, of the value of $96, of the moneys, goods, chattels and personal property of the said county of Arapahoe, in payment of said amount; and that said Roberts, by means of the false pretenses mentioned, feloniously, fraudulently, knowingly and designedly obtained and received from said county the sum of $96, and that the

county was by these false pretenses defrauded of that sum.

Messrs. PATTERSON and THOMAS and L. R. RHODES, for plaintiff in error.

Mr. THEO. H. THOMAS, Attorney-General, for defendants in error.

BECK, C. J. The first error assigned is the denial of the defendant's petition for a change of venue. This petition was not filed until the day preceding the trial. The third section of the statute under which the application was made (R. S. 634) provides as follows: "Changes of venue shall not be granted after the first term at which the party applying for the same might have been heard, unless the cause shall have arisen subsequent to such term." R. S. 636. The indictment was presented to the April term, 1884, of the district court of Arapahoe county, and the cause was removed into the criminal court for trial in the month of May succeeding, and afterwards continued to the June term thereof. On the 11th day of June the defendant filed his plea of not guilty to the indictment, and the cause was then continued to the September term. On September 1, 1884, the cause was set down for trial on September 10th, and on the 9th the petition for change of venue was presented. The ground of the application was the alleged prejudice of the minds of the inhabitants of the county against the defendant. He states that this prejudice was created by sundry publications in the Daily Rocky Mountain News, a newspaper published in the city of Denver, charging him with malfeasance in office, and with obtaining money of the county of Arapahoe by false pretenses, perjury and fraud. All the dates given, except two, are of publications made in the month of February, 1884. The other two were January 31, 1884, and September 7, 1884. The excuse given in the petition for not making the application for the

change of venue at the June term is as follows: "Your petitioner was not until the 8th instant made aware of the extent to which the publications of the said newspaper had prejudiced your petitioner in the minds of the inhabitants of the said county of Arapahoe;   *   *   * and on the 8th instant, for the first time, your petitioner was informed that a strong and prevailing prejudice was and is existing in the minds of the inhabitants of said county against your petitioner; and by inquiry among his friends and acquaintances, your petitioner hath become and is satisfied, and verily believes, that by reason of such prejudice existing against him, your petitioner cannot expect a fair and impartial trial of this cause in this court."

This is not a straightforward averment that the defendant did not know of the prejudice existing in the minds of the inhabitants of the county *before* the 8th instant, but only that he was not aware of the *extent* thereof until that day.   Nor is it clear that his previous knowledge was insufficient to satisfy his mind that he could not expect an impartial trial.   The averments concerning the specific information communicated to him on that day, and the inquiries made thereupon, do not rebut the inferences mentioned.

The provision of our statute above quoted is similar to a corresponding provision of the statute of Illinois on the same subject.   Under said provision the supreme court of that state held that an application for a change of venue must be made at the earliest moment.   Excuses for delay of the character here presented are held insufficient.   In *McCann v. People,* 88 Ill. 103, the ground of the application was the prejudice of the presiding judge, and to account for the delay in making the motion the defendant averred in his affidavit "that a full knowledge of that fact did not come to his knowledge until the day the petition was presented."   The court say: "Giving the affidavit a fair and reasonable interpretation, the

defendant had some knowledge of the prejudice of the judge long before he made the application. That he had not 'full' knowledge is too indefinite, and does not comply with the law. Full knowledge might never come to him; but he had knowledge, and, for aught that appears, it might have been sufficient to satisfy his mind." In *White v. Murtland*, 71 Ill. 258, the petition stated "that he did not know that prejudice existed against him among the inhabitants of said county to the extent that it does, until the 25th day of July, 1872." This petition was held insufficient on two grounds: *First*, it implies he had knowledge that the inhabitants of the county were prejudiced against him before the 25th day of July; *second*, it fails to state when this prejudice arose, or first came to his knowledge.

The present application is more faulty still; for, while it is equally indefinite as to when the knowledge of the prejudice of the inhabitants of the county first came to the defendant's knowledge, it does show that the principal acts creating the prejudice were performed six months before the application was made.

But perhaps a more serious defect in the petition is, it discloses that defendant's want of knowledge as to the extent of the prejudice existing against him was wholly attributable to his own voluntary action. The statement referred to is: "*And your petitioner*, since the publication of the said accusations against him in the said newspaper was commenced, hath continually and carefully avoided, as far as possible, all intercourse with his *neighbors* and citizens, and *especially* all conversation in respect to the said accusations, and the sentiment of the *community* in respect thereto." There is no principle better settled than this: That, when a want of information is set up as an excuse for the failure of a party to avail himself of a legal right within the time prescribed by law, no case for relief exists if it appears that the party voluntarily shut his eyes to the facts, and remained wil-

fully ignorant of the requisite information.    The statute
under consideration is only mandatory upon the court
when the party applying for a change of venue has
brought himself within its provisions.    The defendant,
not having complied with its terms, cannot be said to
have been prejudiced by the denial of his petition.

The second error assigned is the overruling of the mo-
tion for a continuance of the cause.    This motion was
made on the day which had previously been assigned for
the trial, and on which the trial commenced.    It was
based on affidavits showing that three of the four law-
yers in the firm retained by the defendant would neces-
sarily have to attend other courts before this trial would
probably be finished, and that the fourth member of the
firm was sick, and absent from the state.    One of the
courts necessary to be attended by three of the counsel,
according to the affidavits, had not convened at the time
the application was made.    The judge of the criminal
court cannot reasonably be required to postpone the busi-
ness of his court in order to suit the convenience of law-
yers who may desire to attend the sessions of other
courts.    Such a ruling could not be sustained on either
principle or authority, and, if it could, the results would
be detrimental to the public interests, and in many cases
to the interests of suitors as well.    It would in many
instances interfere with the prompt dispatch of business
in the various courts, and tend to prolong their sessions,
thus adding materially to the expenses thereof.

It is contended that the denial of the application in
this case was an abuse of sound discretion, since it de-
prived the defendant of the services of counsel who were
familiar with his case, and forced him into the trial with
new counsel altogether unfamiliar with the facts and the
law.    If the denial of the continuance necessarily pro-
duced all these disadvantages, it ought certainly, in a
case of this character, where the liberty of the citizen is
involved in the issue, to be held an abuse of discretion.

But we do not think such was the necessary result of the ruling. Only one of the defendant's counsel had an engagement for the days occupied by the trial, and the court could not know, at the time of its decision on the motion, that none of defendant's counsel would appear at the trial and take charge of his defense. There was therefore no abuse of discretion in the ruling itself. Had the defendant, on finding himself abandoned by his counsel, brought that fact to the knowledge of the court, with a request for reasonable time to engage other counsel, and for such counsel to familiarize himself with the case, and the questions of law involved, and had such application been denied, much stronger grounds would exist for charging an abuse of judicial discretion. But if, upon the calling of the case for trial, the defendant with his new counsel appeared, and manifested a readiness to proceed, and the record contains nothing to the contrary, it cannot be held to have been the duty of the court, *sua sponte*, to have suggested and ordered a postponement for this purpose.

The third error discussed, and the one under which nearly all remaining objections are discussed, was the overruling of defendant's motion for a new trial. The motion was based on the following grounds: (1) The verdict was contrary to law; (2) it was wholly unsupported by law; (3) it was wholly unwarranted by law. The main contention under this assignment is that there was such a variance between the allegations of the indictment concerning the fraudulent acts charged, and the proofs adduced in support thereof, as rendered the verdict of guilty wholly unwarranted.

The first point urged in support of this theory is that the false representations were alleged to have been made to the county of Arapahoe, and not to an officer of said county, and that the proof only extended to representations made to certain county officers. In prosecutions of this character it is held not to be essential to constitute

the offense charged that the pretenses by which the money or property is obtained were made directly to the party defrauded. An indictment charging false pretenses made to a certain person, and money paid by him on the strength thereof, is supported by proof that the false representations were made to an agent who communicated the same to the principal. 1 Whart. Crim. Law, § 598; 2 Whart. Crim. Law, §§ 2145, 2146; *Commonwealth v. Call*, 21 Pick. 521. The county of Arapahoe, like every other organized county in the state, is made by statute a body corporate and politic, and, like other corporations, it can only act by its officers and agents. The board of county commissioners is authorized by law to represent the county and act for it in the settlement of all accounts of receipts and expenses, and in the allowance of accounts chargeable against the county. This board is authorized to issue orders on the county treasurer for the payment of the accounts so allowed, and it is made the duty of the latter officer to pay the same out of the county money. Gen. St. §§ 538, 635. The board of county commissioners, therefore, is constituted by law the financial representative of the county, to whom all unliquidated claims against the county are to be presented for allowance. No other officer or agent of the county is invested with similar powers; and the presentation of a claim to this board, the allowance of which comes within the scope of its powers, is practically a presentation thereof to the county.

It appears from the evidence that the general custom and practice of presenting claims against the county for allowance by the board of county commissioners was to make out the claim in writing in the form of an itemized account, showing the nature and value of the several items, and the total amount of the claim. To this was attached the affidavit of the person presenting the claim, to the effect that the materials or services charged were furnished or rendered the county; that the account was

just, correct, and that it was due and wholly unpaid. The account was then left with the clerk or deputy clerk who attended the sessions of the board, whose business it was to hand in all accounts presented for allowance against the county. The manner of payment of an account audited and allowed is statutory, and is above stated. This was the course adopted by the defendant. He pursued the various steps above indicated, in accordance with the prevailing usage and practice, and we are of opinion that his conduct in this behalf substantially corresponds with the allegations of the indictment, and that whatever variance may exist in this particular is merely technical. The defect is covered by the principle that, "when the evidence corresponds with the indictment in its general design and purport, a technical variance will not be fatal." 1 Whart. Crim. Law, § 593. The indictment charged a criminal offense, and advised the defendant what acts of his were the subject of complaint. These acts being substantially proven as laid, disposes of this question of variance. It was not necessary for the defendant to appear personally before the board, and to make his representations verbally. The conduct and acts of a party are sufficient to constitute the offense without any verbal assertion. 2 Whart. Crim. Law, § 2113.

There is no force in the objection that the account was not itemized as required by statute. The county commissioners had been allowing accounts for the services of department clerks and assistants, for the same kind of services there charged, upon the county assessment lists, for a period of four years, and there is no ground for saying that the items given did not inform them of the nature of the services claimed to have been rendered in this instance. The items given informed the board that the services were rendered by C. M. Farrar in the month of June, 1883, upon the assessment for that year; that he had worked thereon sixteen days, at the rate of $6 per

day, amounting to the sum of $96.    This was all the information necessary under the circumstances.

The next proposition is that it appeared on the face of the account that it was not a valid charge against the county, and that the board of county commissioners were without authority to audit and allow it.   The first point urged in support of the proposition is that the account was not verified by affidavit, as required by section 545, p. 259, Gen. St.   The evidence shows that the defendant presented the account to the deputy clerk, Sallsbury, made affidavit before that officer to its correctness, and left the same with him for presentation to the board.  But counsel contend that a deputy county clerk is not authorized by statute to administer an oath.   The reasoning by which this conclusion is reached is that the administering of oaths is not one of the duties pertaining to the office of county clerk; that the authority conferred by the statute on the clerk himself is an authority to administer oaths generally, and is wholly independent of his official duties as county clerk.   Under this assumption it is argued that the appointment of a deputy only authorizes him to perform those duties which legitimately pertain to the office itself.   We think the statute is capable of a broader interpretation than counsel have given it.  Ample authority is conferred by the statute on the clerk to administer all oaths necessary to be administered in matters pertaining to the business and duties of his office, and also to administer oaths generally.   The language is: "That the county clerks of the several counties in the state of Colorado be and are hereby authorized, within their respective counties, to administer all oaths of office, and other oaths required to be taken by any person upon any lawful occasion, and to take affidavits and depositions concerning any matter or thing, process or proceeding, pending or to be commenced in any court, or before any justice of the peace, or on any occasion wherein such affidavit or deposition is authorized or required by law to

be taken." The duties enjoined by law on this officer are various, and occasions for the taking of affidavits and for administering oaths must frequently arise in the discharge of his official duties. He is county clerk, clerk of the board of county commissioners, clerk of the board of health in certain cases, and required to act as clerk of the special court constituted by statute for the trial of contested election cases of county officers. The necessity for the exercise of this power exists in all these departments of official duty, from the swearing of a witness in the trial of a contested election case, to the verifying of an account preparatory to its presentation for allowance to the board of county commissioners. The statute provides for the appointment of deputy clerks, and requires the written instruments appointing them to be filed in the clerk's office. It requires these deputies, before entering upon their duties, to take and subscribe the like oath of office as the clerk himself has taken and subscribed, and to deposit the same in the office wherein the clerk's official bond is deposited, and provides that the county clerk, and the sureties upon his official bond, shall be responsible for the official acts of such deputies. Gen. St. pp. 266, 285, §§ 575, 669. The official authority of a deputy, when duly qualified, extends to the performance of all the duties of the office, in case of the absence or disability of the clerk, or in case of a vacancy in his office. Gen. St. p. 266, § 575. It necessarily follows that the deputy is authorized to administer all oaths proper to be administered and taken in the transaction of official business pertaining to said office, and in performing the functions of clerk thereof.

The next objection urged is that the claim did not constitute a legal charge against the county; that the county commissioners allowed it of their own wrong; that the county was not bound thereby, consequently lost nothing by its allowance; hence that the offense charged in the indictment, to wit, the defrauding of the county, was

not established. The ground of this objection is that no provision is made by law for the payment, by the county, of clerical assistance employed by the assessor. It is true that no express provision has been made for this purpose, and it is likewise true that the county commissioners are required by statute, whenever they shall be of opinion that an assessor is unable to perform the duties of his office within the time prescribed by law, to divide the county into assessment districts and to require the assessor to appoint a deputy in each district. Provision is made for the payment of such deputies, not to exceed the sum of $7 per day each. Gen. St. p. 281, §§ 648, 649. Now, the question is, in a county where the duties of the assessor cannot be performed by that officer without clerical assistance, but the county has not been divided into districts as provided for by this statute, may the assessor employ necessary clerks to foot up the assessment rolls, make copies, and do other writing and clerical work necessary to complete the assessment within the time required by law, and will the expenses so incurred constitute a proper charge against the county?

The rule governing the allowance of claims by the board of county commissioners is that the authority must be found in the statute, either in express words or by fair implication. In other words, in order to bind the county, the county commissioners must act within the scope of their authority. Where a claim is clearly not a legitimate charge against the county, the county commissioners have no power to allow it, and its allowance would neither bind nor estop the county; as, for example, where the commissions of a collector of taxes are fixed by statute at a certain rate per cent. and the board allows him a greater rate. But the compensation for every legitimate charge against a county is not fixed by statute, nor even expressly provided for. It is therefore within the functions of the board of county commissioners, in such cases, to allow reasonable compensation.

The county commissioners represent the county, and have charge of its property and the management of its business concerns. They are necessarily vested with reasonable discretion in the administration of county affairs.

Now, with these principles in view, let us turn to the case of a county assessor who is unable to perform all the work of his office, but whose county has not been divided into assessment districts. No power is conferred on the assessor to create such districts, nor can he appoint deputy assessors until such districts are created. Some discretion is lodged in the board of commissioners as to when the necessity arises for such division of the county. It may be that an assessor may be able to perform all the responsible official work of making the assessment, and merely require mechanical or clerical assistance to complete his work within the time prescribed by law. In a pecuniary point of view, this course may be highly advantageous to the county in the saving of unnecessary expenses. Although such a case is not covered by the express provisions of the statute, it is covered by its implied provisions. The spirit of the statute is that a county shall pay for such assistance as is actually necessary. It is proper to consider the consequences of a contrary view. It appears from the record in the present case that it was found necessary to employ from twelve to fourteen clerks in the assessor's office of Arapahoe county in order to dispose of the work as required by law. It not being through any neglect or default of the assessor that the county was not divided into districts, which would have authorized him to appoint deputy assessors, instead of clerks, would it not be highly inequitable to require the assessor to bear the expenses thus necessarily incurred? Having paid his clerks, the assessor's right to reimbursement, although not covered by the express words of the statute, would seem to be fairly implied therefrom; also the power of the commissioners to allow

such claim. The services rendered were clearly beneficial to the county, and connected with the county government. The provisions of the statute for the appointment of deputy assessors are a recognition by the general assembly that assistance for the assessor may become a necessity; and, when it does, it will constitute a proper charge against the county. The necessity clearly appears to have arisen in the present instance, and the assessor seems to have pursued the only course open to him, under the circumstances, so far as the employment of help was concerned. Had he attempted to do all the work himself, he could not have complied with that provision of the statute requiring him to have the assessment roll ready for delivery to the collector by a prescribed day. Unless, then, he is to be held responsible for the default of another department, his reasonable expenses, so incurred, constitute a proper charge against the county, they having been incurred for a legitimate purpose connected with the county government.

A variance is claimed to exist between the allegations of the indictment and the proofs concerning the payment to the defendant, and receipt by him, of the money alleged to have been fraudulently obtained from the county. The indictment charges that the defendant, by certain false pretenses which are set out, defrauded the county out of a certain sum of money. On the part of defendant it is contended that the proof does not show that he even ever got a dollar of this money. The evidence shows that the account presented by the defendant, the same being for the sum of $96, was audited and allowed; that a county warrant for that sum of money, of the par value of $96, was issued, payable to bearer, and delivered to the defendant; that there was at that time money in the county treasury for its payment; and that it was presented to the treasurer and duly paid by him. The treasurer, however, could not state to whom he had paid the money. The county was clearly defrauded of its money

by the defendant, by reason of the false pretenses alleged. C. M. Farrar, whose name had been used for this purpose, had nothing to do with the transaction and received neither the warrant nor the money. In fact, he did not know that such an account had been presented, nor that a county warrant had been issued or paid, until long afterwards. He had served but seven and one-half days instead of sixteen days, as alleged by defendant, and at a *per diem* of $4 instead of $6, as represented by the account filed. Under all the circumstances in evidence, the presumption of facts obtains that the defendant presented or caused the warrant to be presented, and obtained the money.

It is contended that the proof in this particular is insufficient, for the reasons that, the warrant being negotiable by transfer merely, and payable to bearer, defendant may have lost it, and the finder obtained the money, or that a thief may have stolen it, and the treasurer made payment to him. Neither of these suppositions are verified by human experience as a natural or usual result in such case. Such a result being unusual, the presumption of fact is therefore the other way. A presumption of a fact is an inference of the existence of a certain fact arising from its necessary and usual connection with other facts which are known. The principle is recognized in criminal jurisprudence that proof of certain facts may lead irresistibly to the presumption that another act, of which there is no direct proof, was committed or done. Men are presumed to act according to their own interests. It is presumed that regular and ordinary means are adopted for a given end. So where the means calculated to attain a certain end appear to have been adopted, and the end itself appears to have been attained, a particular completion will be presumed. 1 Phil. Ev. *599– *610. In the present instance, the end in view was attained. The means adopted involved several steps, all of which were established by direct proof, except the

presentation of the warrant and receipt of the money by the defendant. But the warrant was worth its face in the market. It was not necessary that defendant should himself present it to the treasurer in order to realize the money, or in order that the county should be defrauded of its money by the acts of the defendant. No evidence denying the receipt of the money was offered, and no explanation of the facts proven against the defendant was given. The point under consideration, therefore, falls within the rule that when the nature of the case admits of explanation or contradiction, and enough has been proven against a party to warrant a reasonable conclusion against him in the absence of explanation or contradiction, and none is offered, the law warrants the adoption of the conclusion to which the proof tends.

But, in addition to the inference deducible from the facts mentioned, the confession of the defendant, made to the board of commissioners after the transaction specified in the indictment, was before the jury. He therein admitted that he had been thus imposing on the county for the past three or four years and had realized thereby, as nearly as he could estimate, about $3,108. The verdict appears to have been duly warranted by the evidence.

Other objections to the proceedings are discussed, none of which we deem fatal, and, upon a review of the entire record and the errors assigned, we are of the opinion that no sufficient errors appear therein to warrant a reversal of the judgment. It is therefore affirmed.

*Affirmed.*